Harllel B. JONES, Plaintiff–Appellant,

v.

**FEDERAL BUREAU OF INVESTI-
GATION, Defendant–Appellee.**

No. 92–3962.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 14, 1994.
Decided Nov. 17, 1994.

Richard L. Aynes (argued and briefed), Akron, OH, for plaintiff-appellant.

Leonard Schaitman, Robert M. Loeb, U.S. Dept. of Justice, Civ. Div., Appellate Staff, John F. Daly (briefed), U.S. Dept. of Justice, Elizabeth A. Pugh, David M. Souders, Malcolm L. Stewart (argued and briefed), U.S. Dept. of Justice, Civ. Div., Washington, DC, for defendant-appellee.

Before: MERRITT, Chief Judge; and CELEBREZZE and JONES, Circuit Judges.

MERRITT, Chief Judge.

Plaintiff Harllel Jones was the founder and leader of a group called "Afro Set" or the "Black Nationalist Party for Self Defense" in Cleveland in the 1960s and 1970s. Almost twenty years ago, Jones filed requests pursuant to the "Freedom of Information Act" (FOIA), 5 U.S.C. § 552, seeking all documents pertaining to himself or Afro Set held by the defendant Federal Bureau of Investigation and the United States Secret Service. The FBI eventually located 2,936 responsive documents comprising 10,485 pages, primarily within four central FBI files and various corresponding Cleveland and Cincinnati field office files. The agency released 485 pages in their entirety; released 9,157 pages with

portions redacted; and withheld 845 pages in their entirety.

In 1977, Jones filed suit in federal district court to compel release of the withheld material.[1] Eight different district judges were responsible for the case at different times over the course of fifteen years,[2] until in August 1992 Judge Matia entered an order granting summary judgment to the FBI. Jones appeals this order.

Because of its controversial historical background, as well as the long delays and enormous number of responsive documents, this is a particularly difficult case. Prior to judging the individual statutory exemptions claimed by the FBI to justify its withholdings, we must decide two important questions of FOIA law: first, under what circumstances a district court should look beyond the affidavits submitted by the defendant agency and examine responsive documents in unredacted form *in camera;* second, whether material responsive to a FOIA request may be withheld under any of the exemptions created by subsection (b)(7) of the FOIA statute if some of the underlying activities may not have conformed with legitimate law enforcement purposes.

## I. Background

Beginning in 1965 and apparently continuing until 1977, Harllel Jones and Afro Set were targets of the FBI's Black Nationalist Counterintelligence Program (COINTELPRO). Seen in its best light, COINTELPRO was organized to gather information on violent individuals and groups, some of whom intended to overthrow our constitutional government. Seen in worse light, COINTELPRO targeted African–Americans of local and national prominence as part of organized resistance to their struggles to secure civil rights for all Americans. To illustrate, COINTELPRO's targets included both the Black Panther Party, whose membership included undeniably violent individuals, and the Rev. Dr. Martin Luther King, whose birthday we now celebrate as a national holiday. It is well known, for example, that the FBI expended considerable resources attempting to undermine the work of Dr. King by linking him to allegedly subversive organizations and by discovering details of his personal life. *See Lesar v. U.S. Dep't of Justice,* 636 F.2d 472, 487 (D.C.Cir.1980).

In 1976, the Senate Select Committee on Intelligence (the Church Committee) issued a report documenting systematic violations of civil rights by the FBI and other intelligence and security organizations.[3] COINTELPRO was among the operations discussed in the report, which quoted at length from an FBI internal memorandum describing COINTELPRO's goals. According to this memorandum, the FBI's goals were to "Prevent the *coalition* of militant black nationalist groups"; "Prevent the *rise of a 'messiah'* who could unify, and electrify, the militant black nationalist movement"; "Prevent *violence* on the part of black nationalist groups"; "Prevent militant black nationalist groups and leaders from gaining *respectability* "; and "Prevent the long-range *growth* of militant black nationalist organizations, especially among youth" (emphasis in original). The Church Committee characterized COINTELPRO as "a sophisticated vigilante operation aimed squarely at preventing the exercise of First Amendment rights[.]" Senate Report, Book III at 6. The Seventh Circuit stated that this memorandum is "damning evidence indicating the COINTELPRO was intended to do much more than simply 'prevent violence[.]' " *Hampton v. Hanrahan,* 600 F.2d 600, 608–09 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). In his brief on appeal Jones cites numerous publications describing the misconduct of the FBI. There seems little doubt that under COINTELPRO the

1. Plaintiff originally named nine other institutional and individual defendants. The FBI is the only remaining party defendant.

2. Judges Battisti, Krupansky, Manos, Krenzler, Dowd, Bell, Batchelder, and Matia. The case was first assigned to Judge Matia in December 1991.

3. *See* Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, Final Report, S.Rep. No. 94–755, 94th Cong., 2d Sess. (1976).

agency did not observe its duty to uphold the civil liberties of American citizens.

In August 1970 members of Afro Set shot two police officers in Cleveland, killing one. In March 1972, based primarily upon information supplied by a member of Afro Set who had become a confidential FBI informant, Jones was convicted in state court of second-degree murder and shooting with intent to kill or wound. The informant, a co-defendant and admitted triggerman, testified that Jones had ordered the members of Afro Set to shoot police officers and security guards at random in retaliation for the shooting of an Afro Set member by a security guard. In return, first-degree murder charges against the informant were dropped. In 1975, the same year he filed his FOIA requests, Jones filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asking that his conviction be vacated on the ground that the prosecution had failed to provide his counsel with either an exculpatory written statement of a co-indicted witness or the fact of the prosecution's agreement to drop charges against the main informant. The habeas court granted the writ in 1977 and Jones was freed. *Jones v. Jago*, 428 F.Supp. 405 (N.D. Ohio 1977), *aff'd*, 575 F.2d 1164 (6th Cir.), *cert. denied*, 439 U.S. 883, 99 S.Ct. 223, 58 L.Ed.2d 196 (1978). From the record before us, it appears that the documents he obtained through his FOIA requests helped Jones win his habeas case. The state failed in its attempt to have him reimprisoned pending retrial and in 1978 the charges were dismissed.

## II.  Procedural History

The FBI justified its withholdings in this case under exemptions set forth in 5 U.S.C. § 552(b).[4] Early in the case, Jones moved to require the FBI to submit a *Vaughn* index of the entire document set. A *Vaughn* index is a routine device through which the defendant agency describes the responsive documents withheld or redacted and indicates why the exemptions claimed apply to the withheld

material. *Vaughn v. Rosen*, 484 F.2d 820, 826–27 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). Jones's motion was denied as premature, and it is unclear to us why no significant action was taken in the case during the next five years.

In late 1982, the FBI moved for leave to employ a random sample to select a smaller group of representative documents, for which the agency would then produce a *Vaughn* index. Plaintiff renewed his motion to require defendants to file a complete index. The district court granted the FBI's motion on the ground that "[t]o require the defendant to produce a *Vaughn* index covering each and every page of the withheld documents would be an excessive burden at this stage of the proceedings." Order, April 14, 1983, at 3. The FBI submitted the sample in redacted form to the district court in March 1984 along with the declarations of Special Agents Walter Scheuplein, Jr., and Robert F. Peterson, two affidavits which together constituted the original *Vaughn* index in this case. These affidavits explained the agency's central records system, related the FBI's search for and collection of documents, described the preparation of the sample, and justified the exemptions claimed. Since the original sample included none of the fourteen documents with material withheld under Exemption 7(E), later in 1984 the FBI submitted these documents to the court with a second declaration from Agent Scheuplein. This brought the total number of documents before the court to 72. At the same time that he approved the use of the sample, Judge Bell also granted the FBI's motion for a protective order staying discovery. Order, April 14, 1983, at 4–5.

The FBI moved for summary judgment on the basis of the sample and affidavits. Plaintiff filed his own cross-motion for summary judgment, and the case remained on these motions for a number of years before being referred to a magistrate judge in early 1990.

---

4.  Federal agencies are permitted to withhold material in requested documents for various reasons. Five of these statutory exemptions are at issue in this case: (1), concerning national defense or foreign policy; (2), concerning internal

personnel rules and practices; (7)(C), concerning personal privacy; (7)(D), concerning confidential informants and information; and (7)(E), concerning agency techniques and procedures. 5 U.S.C. § 552(b).

In June 1991 the magistrate recommended granting the FBI's motion for summary judgment, and in August 1992 Judge Matia so granted, holding that the affidavits and sample were sufficient information on which to base a finding and that on this basis the FBI had properly claimed the various exemptions at issue. Opinion and Order, Aug. 12, 1992.

## III. Basis of Review

■ A district court reviews *de novo* an agency's decisions regarding a FOIA request. 5 U.S.C. § 552(a)(4)(B). As this appeal is from a grant of summary judgment, our review is *de novo* as well. FOIA cases typically come up on appeal in this fashion, based on the defendant agency's *Vaughn* affidavits and before the plaintiff has had a chance to engage in discovery. This is a peculiar posture, difficult for our adversarial system to handle. The problem goes to the very nature of these actions as petitions for the release of documents. Where material has been withheld by the government agency, the plaintiff must argue that the withholding goes beyond that allowed by the statute. But the plaintiff is handicapped in this endeavor by the fact that only the agency truly knows the content of the withheld material. *See Vaughn v. Rosen,* 484 F.2d at 823–24; *McDonnell v. United States,* 4 F.3d 1227, 1241 (3d Cir.1993); *Wiener v. F.B.I.,* 943 F.2d 972, 977 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3013, 120 L.Ed.2d 886 (1992). Except in cases in which the court takes the entire set of responsive documents *in camera,* even the court does not know.

For several decades federal courts have struggled with how to level this unequal playing field. At the same time, courts have needed to formulate workable rules for the FOIA context. *U.S. Dep't of Justice v. Reporters Committee for Freedom of Press,* 489 U.S. 749, 779, 109 S.Ct. 1468, 1485, 103 L.Ed.2d 774 (1989). These concerns led to the use of *Vaughn* indices, described above. In this circuit, no precise form is dictated for these affidavits; any form is acceptable which "enables the court to make a reasoned, independent assessment of the claim[s] of exemption." *Vaughn v. United States,* 936 F.2d 862, 866–67 (6th Cir.1991).

■ Plaintiff argues that the FBI's affidavits in this case are inadequate to explain the agency's exemption claims fully and insufficient to permit him to make his case that the FBI has applied the exemptions too broadly. Plaintiff also asserts that the initial sample was an insufficient factual basis upon which to consider the FBI's motion for summary judgment. We disagree. The affidavits here are of the kind that have become accepted practice and they are sufficiently detailed for this type of document. We also agree with the district court that "[w]here, as here, a large number of documents have been withheld from disclosure by the government, it would not be realistically possible for the Court to review all of the documents at issue." Opinion and Order, Aug. 12, 1992, at 4. In this case, the sample included 197 pages of material and constituted 2% of the documents at issue, and under normal circumstances a random sample of this size would be sufficient to allow the court to review the government's claims of exemption. *Meeropol v. Meese,* 790 F.2d 942, 958 (D.C.Cir.1986) (approving use of sample consisting of 1% of documents); *Weisberg v. U.S. Dep't of Justice,* 745 F.2d 1476, 1490 (D.C.Cir.1984) (approving sample of 1/2%).

■ Our procedural inquiry does not end here, however. Use of *Vaughn* affidavits is normal procedure in FOIA cases because (1) detailed description of material withheld could reveal exactly what the agency may be entitled or required to withhold; and (2) agency actions and affidavits are normally entitled to a presumption of good faith. *U.S. Dep't of State v. Ray,* 502 U.S. 164, ——, 112 S.Ct. 541, 550, 116 L.Ed.2d 526 (1991). This presumption may be overcome where there is evidence of bad faith in the agency's handling of the FOIA request. Even where there is no evidence that the agency acted in bad faith with regard to the FOIA action itself there may be evidence of bad faith or illegality with regard to the underlying activities which generated the documents at issue. Where such evidence is strong, it would be an abdication of the court's responsibility to treat the case in the

standard way and grant summary judgment on the basis of *Vaughn* affidavits alone. It would risk straining the public's ability to believe—not to mention the plaintiff's—that the courts are neutral arbiters of disputes whose procedures are designed to produce justice out of the clash of adversarial arguments.

The instant case presents such evidence. COINTELPRO went beyond the detection and prevention of criminal activity; the program's infringements of civil liberties seem well documented; and because the FBI worked closely with local law enforcement and supplied the key prosecution witness, the program is tied to the tainted prosecution of plaintiff for murder. This does not prove that the FBI acted in bad faith with regard to the FOIA request, but it does mean that the courts of this circuit should not process this case in the same manner as they would a request for documents regarding a routine FBI investigation.

FOIA gives a district court the power to take documents *in camera*. 5 U.S.C. § 552(a)(4)(B). While it is not erroneous for a district court to decline to do so "where other evidence provides adequate detail and justification," *Vaughn v. United States,* 936 F.2d at 869, *in camera* review is called for in certain circumstances:

> [T]he decision to exercise a court's discretion to review material *in camera* ultimately involves consideration of the following factors: 1) *judicial economy*—every court on record has expressed significant concern about imposing a line by line review upon trial and appellate courts in resolving FOIA requests involving hundreds or thousands of documents; 2) *actual agency bad faith*—where it becomes apparent that the subject matter of a request involves activities which, if disclosed, would publicly embarrass the agency or that a so-called "cover up" is presented, government affidavits lose credibility; 3) *strong public interest*—where the effect of disclosure or exemption clearly extends to the public at large, such as a request which may surface evidence of corruption in an important government function, there may be a reason to give lesser weight to factors like judicial economy; 4) *the parties request in camera review*—obviously the court cannot be required to conduct a review upon demand, but a request would ameliorate concern that *in camera* inspection was precluding vigorous adversary proceedings or that a court was stepping into an area, as national security, which is the province of the Executive.

*Ingle v. Dep't of Justice,* 698 F.2d 259, 267 (6th Cir.1983) (emphasis in original). The court also cautioned that a trial court should undertake *in camera* inspection only after (1) "attempting to adequately resolve the matter by a Vaughn Index," (2) considering other possible procedures short of "full *in camera* examination," and (3) allowing argument by the parties on the propriety of *in camera* review. *Id.* In the instant case all three prerequisites have been satisfied.

In the language of *Ingle,* Jones's request clearly involves "activities which, if disclosed, would publicly embarrass the agency," and "the effect of disclosure or exemption clearly extends to the public at large." Although this circuit has suggested that *in camera* review is disfavored because it circumvents the adversarial process, *Vaughn v. United States,* 936 F.2d at 866, we believe that it is sometimes a necessary risk. In certain circumstances the court *must* play a more active role because no other party or institution is available to ensure that the agency's assertions are reliable. Moreover, there is no danger in the instant case of circumventing "vigorous adversary proceedings" because plaintiff requested *in camera* inspection and defendant has always had full access to the documents at issue. Nor would *in camera* review have been an undue burden upon judicial resources, as the trial court had approved use of a manageable sample. As a result, the district court should not have granted summary judgment solely on the basis of the affidavits and should have conducted an *in camera* review of the sample.

At oral argument, therefore, we asked plaintiff to select roughly 350 pages from among the thousands which the FBI had redacted. When added to the original random sample, this "plaintiff's choice" made a total of 167 documents comprising 553 pages,

which the FBI submitted to us under seal and in unredacted form for our *in camera* examination.[5] The final sample represents more than five per cent of the total document pool, whether measured in documents or in pages, and constitutes a more than adequate sample of a document pool this large. With this augmented sample, the *Vaughn* affidavits, and our own *in camera* review, there is now sufficient information before this court to decide whether the FBI has properly withheld material responsive to plaintiff's FOIA request.

## IV. Exemptions

FOIA's overall goal is " 'to open agency action to the light of public scrutiny.' " *Reporters Committee*, 489 U.S. at 772, 109 S.Ct. at 1481 (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361, 372, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976)); *Ray*, 502 U.S. at ——, 112 S.Ct. at 547. FOIA calls for full disclosure of the activities of federal agencies " 'unless information is exempted under clearly delineated statutory language.' " *Rose*, 425 U.S. at 360–61, 96 S.Ct. at 1598–99 (quoting S.Rep. No. 813, 89th Cong., 1st Sess. 3 (1965)). The exemptions are to be "narrowly construed," *Rose*, 425 U.S. at 361, 96 S.Ct. at 1599, and the burden is on the defendant "agency to demonstrate, not the requester to disprove, that the materials sought may be withheld due to an exemption." *Vaughn v. United States*, 936 F.2d at 866 (citing 5 U.S.C. § 552(a)(4)(B)); *Ray*, 502 U.S. at ——, 112 S.Ct. at 547.

## Exemption 1

FOIA Exemption 1 permits a federal agency to withhold "matters that are—(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of *national defense or foreign policy* and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1) (emphasis added). The FBI redacted one document in the sample pursuant to this exemption and asserted that it con-

tains "intelligence activities . . ., sources, or methods" ordered to be kept secret under Executive Order 12356 § 1.3(a)(4). Specifically, the agency used this subsection to withhold "numerical designators that are exclusively assigned to national security sources." Peterson Declaration ¶ 6. The FBI judged that "disclosure of this information could reveal the identity of national security sources reporting foreign counterintelligence information to the FBI." *Id.* ¶ 5.

In determining the applicability of Exemption 1, a reviewing court should accord "substantial weight" to the agency's affidavits regarding classified information. *Patterson v. F.B.I.*, 893 F.2d 595, 601 (3d Cir.), *cert. denied*, 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990); *Halperin v. CIA*, 629 F.2d 144, 147–48 (D.C.Cir.1980); *Hayden v. National Security Agency*, 608 F.2d 1381, 1387 (D.C.Cir.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). Having examined the document *in camera* and in light of the Peterson Declaration, we conclude that it was properly classified under Executive Order 12356 and that the FBI therefore properly withheld the information.

## Exemption 2

FOIA Exemption 2 permits a federal agency to withhold materials "related solely to the *internal personnel rules and practices* of an agency." 5 U.S.C. § 552(b)(2) (emphasis added). This exemption applies to " 'routine matters' of 'merely internal significance' in which the public lacks any substantial or legitimate interest." *Lesar*, 636 F.2d at 485 (quoting *Rose*, 425 U.S. at 370, 96 S.Ct. at 1603); *see also Schwaner v. Dep't of Air Force*, 898 F.2d 793, 796 (D.C.Cir.1990). The FBI has claimed this exemption "to delete FBI symbol numbers and file numbers which are used internally by the FBI to identify confidential sources." First Scheuplein Declaration ¶ 27.

This court has previously upheld the use of Exemption 2 to withhold informant symbol

---

5. The entire document pool was procedurally before the district court, which chose to view only a portion of it selected by random sample. Because the entire pool was also therefore before

us, and because our review is *de novo*, it was not necessary for us to remand to the district court to view the expanded sample.

and file numbers. *Kiraly v. F.B.I.*, 728 F.2d 273, 276 n. 6 (6th Cir.1984); *see also Lesar*, 636 F.2d at 485–86. Having reviewed the sample *in camera* and in light of the First Scheuplein Declaration, we conclude that the FBI has properly claimed this exemption.

### Threshold for Exemptions 7(A–F)

■ FOIA permits the agency to withhold responsive documents which constitute "records or information compiled for law enforcement purposes" and which also meet at least one of six additional criteria. 5 U.S.C. § 552(b)(7).[6] The FBI has claimed three of these exemptions: 7(C), which guards against "unwarranted invasions of personal privacy"; 7(D), which protects confidential sources; and 7(E), which safeguards law enforcement techniques and procedures. The agency is not entitled to withhold any material on the basis of these exemptions unless those materials are "records or information compiled for law enforcement purposes." *John Doe Agency v. John Doe Corporation*, 493 U.S. 146, 153, 110 S.Ct. 471, 475, 107 L.Ed.2d 462 (1989). There has been disagreement among the circuits about how to make this threshold determination.

Three circuits have adopted a *per se* rule, under which records compiled *by* a law enforcement agency qualify as "records compiled *for* law enforcement purposes" under FOIA. *See Irons v. Bell*, 596 F.2d 468, 473–75 (1st Cir.1979); *Curran v. Dep't of Justice*, 813 F.2d 473, 475 (1st Cir.1987); *Williams v. FBI*, 730 F.2d 882, 884–85 (2d Cir.1984); *Ferguson v. FBI*, 957 F.2d 1059, 1070 (2d Cir.1992); *Kuehnert v. FBI*, 620 F.2d 662, 666 (8th Cir.1980). The D.C. Circuit has rejected this analysis as reading the threshold out of the statute and has adopted a "rational nexus" rule: in order for documents

stemming from an investigation to be withheld under any of the (b)(7) exemptions, the agency must demonstrate that there is a "nexus between the investigation and one of the agency's law enforcement duties [that is] based on information sufficient to support at least 'a colorable claim' of its rationality." *Pratt v. Webster*, 673 F.2d 408, 421 (D.C.Cir. 1982). The Ninth Circuit appears to have adopted this test as well. *Wiener*, 943 F.2d at 985. *See also Arenberg v. DEA*, 849 F.2d 579, 581 (11th Cir.1988).

While at first blush the "nexus" rule might seem better tailored to FOIA's goal of "open[ing] agency action to the light of public scrutiny," closer inspection reveals that the *per se* rule comports more fully with the policies Congress enacted in FOIA. For example, Exemption 7(C) protects against "unwarranted invasion of personal privacy." A document may be withheld if it meets the "law enforcement" threshold and if its release could subject an individual to embarrassment or harassment as a result of being identified as a subject of FBI inquiry. The "nexus" rule would protect that individual's privacy when the FBI acts within its statutory mandate but not when the FBI undertakes an unauthorized investigation. Such a result would be an anomaly and "would harm innocent individuals who had no way to test the legality of an FBI investigation." *Irons v. Bell*, 596 F.2d at 474. The same analysis applies to Exemptions 7(B) and 7(F), which are not at issue in this appeal.

Exemption 7(D) is meant to protect the confidentiality of sources and thus to enhance the ability of federal agencies to gain their cooperation. Without the *per se* rule a source who cooperated with an understanding of confidentiality might be subject to

---

**6.** The full text provides for the withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which

furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual[.]" 5 U.S.C. § 552(b)(7).

exposure "whenever [a court] determines an investigation by a law enforcement agency [was] unfounded," and the possibility of such exposure through FOIA will "substantially impair federal law enforcement." *Williams,* 730 F.2d at 885; *see also Irons v. Bell,* 596 F.2d at 474–75.

The D.C. Circuit based its adoption of the "nexus" test in part on its finding that Congress intended the 1974 FOIA amendments to narrow the law enforcement exemption and to prevent agencies from overbroad withholding of administrative and regulatory records under the guise of general law enforcement.[7] *Pratt,* 673 F.2d at 417. However, we are persuaded that the amendments did not intend to make the law enforcement threshold the principal enforcer of this policy. The primary effect of the amendments upon § (b)(7) was the insertion of the six subcategories, thereby adding the requirement "that the agency demonstrate that disclosure of a law enforcement investigatory record would cause one of six specific harms." *Irons v. Bell,* 596 F.2d at 474–75. We conclude from this that Congress considered the enumeration of these specific bases for withholding material to be the principal means for narrowing the law enforcement exemption. The concern about overbroad withholding should therefore be addressed by proper scrutiny of the claimed exemptions themselves and not by use of a blunt instrument at the threshold which would harm the other policies Congress deemed important. *See Irons v. Bell,* 596 F.2d at 476. In the instant case we have taken a large sample of the documents *in camera* in order to engage in heightened scrutiny of the exemptions.

There may be cases in which this court will be required to decide whether a given federal agency qualifies as a law enforcement agency for the purpose of claiming the (b)(7) exemptions in a given case. Or there may be cases in which an investigation is so far beyond the authority of the agency or so Gestapo-like in its methods that we would say that it does not meet the test for the law enforcement exception. Here, however, the FBI is the archetypical federal law enforcement agency and its methods were not so far out of bounds that the overall investigation is outside the law enforcement exception. Applying the *per se* rule in this case, therefore, we find that the documents at issue here are "records or information compiled for law enforcement purposes" and that the FBI may claim the (b)(7) exemptions. We need not dispute plaintiff's contention that certain activity conducted under COINTELPRO targeted him and other individuals because of their exercise of First Amendment rights to free expression and free association. To the extent that the agency violates the constitutional rights of citizens, there are remedies such as *Bivens* actions, or § 1983 in the case of state and local law enforcement agencies. FOIA was intended as a sunshine measure to bring agency operations to public knowledge within specified limits, not as the primary vehicle for prosecuting agency misbehavior.

### Exemption 7(C)

■ Documents which meet the law enforcement threshold and whose release "could reasonably be expected to constitute an *unwarranted invasion of personal privacy*" may be withheld or redacted. 5 U.S.C. § 552(b)(7)(C) (emphasis added). The use of the word "unwarranted" requires the court to balance the privacy interest of the individual in the document against the public interest in disclosure. *Rose,* 425 U.S. at 372–73, 96 S.Ct. at 1604–05. The Supreme Court has defined that public interest in terms of the relationship of the information requested to the purpose of FOIA " 'to open agency action to the light of public scrutiny.' " *Reporters Committee,* 489 U.S. at 772, 109 S.Ct. at 1481 (quoting *Rose,* 425 U.S. at 361, 372, 96 S.Ct. at 1599, 1604). Here, the FBI has withheld the identities of its own agents, other federal employees, state and local law enforcement personnel, confidential informants, and other third parties who appear in the documents.

This circuit has previously found that federal law enforcement officials "have the right to be protected against public disclosure of

---

7. Before the 1974 amendments, § (b)(7) simply provided that disclosure did not apply to "investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency[.]"

their participation in law enforcement investigations pursuant to exemption (b)(7)(C)." *Ingle,* 698 F.2d at 269; *see also Kiraly,* 728 F.2d at 276 n. 6. On the other side of the equation, FOIA recognizes the disclosure interest of the *public,* not the private litigant. *Reporters Committee,* 489 U.S. at 771, 109 S.Ct. at 1480–81 ("the identity of the requesting party has no bearing on the merits of his or her FOIA request"); *see also Kiraly,* 728 F.2d at 279. Under FOIA the public has an interest in knowing what the agency is doing. This interest certainly includes knowledge of official abuse, corruption, and illegal acts, but the evidence before us does not show that disclosure of the identities of individual agents will significantly further that interest. In most cases, as the district court concluded, "[t]he identity of these persons does not shed any light on the operations of the FBI." Opinion & Order, Aug. 12, 1992, at 12. From our *in camera* review, we conclude that the withholding of these identities does not significantly limit the picture these documents paint as to what the FBI was up to and what it knew about plaintiff, Afro Set, and their activities. Disclosure of the identities of FBI agents in these documents is therefore "unwarranted" in the terms of Exemption 7(C).

■ We must reject plaintiff's argument that certain agents waived 7(C) protection by testifying at plaintiff's habeas proceeding. Exemption 7(C) leaves the decision about publicity—whether and how much to reveal about herself—in the power of the individual whose privacy is at stake. *Reporters Committee,* 489 U.S. at 763, 109 S.Ct. at 1476 (the privacy interest "encompass[es] the individual's control of information concerning his or her person"). The fact that an agent decided or was required to testify or otherwise come forward in other settings does not give plaintiff a right under FOIA to documents revealing the fact and nature of her employment. *Kiraly,* 728 F.2d at 280.

The analysis above applies equally to other federal employees and to state and local law enforcement personnel, *see Massey v. F.B.I.,* 3 F.3d 620, 624 (2d Cir.1993), and with at least equal force to third parties interviewed by the FBI or who provided information in the course of their employment. The analy-

sis applies *a fortiori* to other third parties appearing in the documents, for whom connection with an FBI investigation carries significant risk of embarrassment and about whom even less argument can be made as to the public's interest in disclosure of their identities. As the Supreme Court has written, "FOIA's central purpose is to ensure that the *Government*'s activities be opened to the sharp eye of public scrutiny, not that information about *private citizens* that happens to be in the warehouse of the Government be so disclosed." *Reporters Committee,* 489 U.S. at 774, 109 S.Ct. at 1482 (emphasis in original).

### Exemption 7(D)

■ Documents which meet the threshold and whose release "could reasonably be expected to disclose the identity of a *confidential source,* including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis," may be withheld or redacted. 5 U.S.C. § 552(b)(7)(D) (emphasis added). This exemption does not involve a balancing of public and private interests; if the source was confidential, the exemption may be claimed regardless of the public interest in disclosure. *Lesar,* 636 F.2d at 492; *Irons v. F.B.I.,* 880 F.2d 1446, 1449 (1st Cir.1989) (*en banc*); *Ferguson,* 957 F.2d at 1068; *McDonnell,* 4 F.3d at 1258.

The Supreme Court has recently analyzed this exemption. *U.S. Dep't of Justice v. Landano,* —— U.S. ——, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993). In *Landano,* the Court wrote that "a source is confidential within the meaning of Exemption 7(D) if the source 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'" *Id.* at ——, 113 S.Ct. at 2019 (quoting S.Rep. No. 1200, 93rd Cong. 2d Sess. 13 (1974)), U.S. Code Cong. & Admin. News 1974 at pp. 6267–6291. The Court unanimously held that the government is not entitled to a presumption that all sources supplying information to the FBI in the course of a criminal investigation are confidential within the meaning of Exemption 7(D). However, in some narrowly defined

circumstances, having to do with the nature of the crime at issue and the source's relation to the crime, it may be reasonable to presume that certain categories of sources cooperated with the FBI with an implied assurance of confidentiality. *Id.* at ——, 113 S.Ct. at 2023–24. Justice O'Connor gave as an example paid informants, about whom "it is reasonable to infer that [they] normally expect their cooperation with the FBI to be kept confidential." *Id.* at ——, 113 S.Ct. at 2023. "There may well be other generic circumstances in which an implied assurance of confidentiality fairly can be inferred." *Id. Landano* did not disturb the obvious point that sources who spoke with *express* assurances of confidentiality are always "confidential" for FOIA purposes. *Id.* at ——, 113 S.Ct. at 2019–20.

The FBI originally claimed Exemption 7(D) with regard both to sources who were expressly guaranteed confidentiality and to sources who gave information to the FBI under circumstances from which the agency argued that confidentiality had been implied. Rather than test the application of *Landano* to "implied" confidentiality under the circumstances of the instant case, the FBI conducted a re-review of the documents in the augmented sample against both the new standard for 7(D) and the new policy of greater disclosure which had been promulgated by the White House and applied to the Department of Justice by memorandum of Attorney General Janet Reno dated October 4, 1993. The agency asserts that it has now released to plaintiff any material in the augmented sample which formerly was withheld under 7(D) but which cannot now be withheld on the grounds of an express guarantee of confidentiality.[8] First Declaration of SA Michael D. Turner ¶¶ 3–7. Agent Turner asserts that it is clear from the faces of documents, from their context, and from his knowledge of routine FBI practices that the sources in connection with whom the FBI still claims Exemption 7(D) received *express* assurances of confidentiality. Second Turner Declaration ¶ 3. On the basis of our *in camera* review, we find the Turner Declarations reliable.

The FBI withheld source symbol numbers, file numbers, and temporary symbols used to protect the identities of confidential sources, asserting that "[t]hese are reserved for confidential sources, whether individuals or organizations, who provide sensitive information to the FBI on a regular basis." First Scheuplein Declaration ¶ 44. Plaintiff argues that such use only shows that the FBI endows the source with secrecy, not that the source itself understood its transaction with the FBI to be confidential. Based on our *in camera* review, including scrutiny of the type of information supplied by the sources, we find that in this case the FBI has used these numbers and symbols as described in the affidavits.

■ The FBI has also properly withheld information furnished in confidence by financial or commercial institutions. The agency maintains that use of 7(D) as to this subcategory is appropriate because the documents assign source symbols to the individuals involved or contain words which indicate that the information in the documents is not to be made public except pursuant to subpoena. Second Turner Declaration ¶ 7. Again, we find on the basis of our review that the circumstances adequately indicate that this information was furnished under an express guarantee of confidentiality. The material withheld is such as "could reasonably" disclose the identity of these sources.

The FBI has also invoked 7(D) with respect to three documents in the sample containing information provided by non-Federal law enforcement agencies. Second Turner Declaration ¶ 10. By the terms of the statute, such agencies may be confidential sources, and our review confirms the agency's assertion that the express assurance of confidentiality is clear from the face of the documents.

■ Plaintiff argues that the FBI cannot use Exemption 7(D) where the identity of the person in question is known—e.g., the confidential informant who became the lead government witness in the murder case against him. We must reject this argument. Al-

---

**8.** The FBI concedes that it is now obligated to perform this same review and release upon the

entire document set, Supplemental Brief at 5 n. 3, and we hereby order it to do so.

though the Supreme Court left this question open in its recent *Landano* opinion, at ——, 113 S.Ct. at 2020, the majority of appellate decisions construe the language of 7(D) to provide for exemption if the source cooperated with the FBI with an understanding of confidentiality and do not engage in any calculus as to the extent to which that source has already been revealed. *Kiraly*, 728 F.2d at 278–80; *Lesar*, 636 F.2d at 491; *Parker v. Dep't of Justice*, 934 F.2d 375, 380–81 (D.C.Cir.1991); *Irons v. F.B.I.*, 880 F.2d at 1449, 1456–57; *Ferguson*, 957 F.2d at 1068. We agree with these courts that 7(D) focuses on the source's intent, not the world's knowledge; it provides for nondisclosure of all sources who provided information with an understanding of confidentiality, not for protection of only those sources whose identity remains a secret at the time of future FOIA litigation. To hold otherwise would discourage sources from cooperating with the FBI because of fear of revelation via FOIA.

**Exemption 7(E)**

FOIA Exemption 7(E) permits a federal agency to withhold materials which "would disclose *techniques and procedures* for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552(b)(7)(E) (emphasis added). The FBI used this exemption "to withhold lawful investigative techniques not generally known to the public which continue to be successfully used today" and asserts that "[t]he disclosure of these techniques could result in subjects of FBI investigations taking additional steps to avoid detection." Second Scheuplein Declaration ¶ 12. As a result of our *in camera* inspection, we find that the FBI has properly used 7(E) to delete information regarding investigative techniques.

**V. Destruction of Documents and Discovery**

The discussion thus far has had to do with documents in various FBI files at the time of plaintiff's FOIA request. Plaintiff also raises issues relating to documents which by the agency's own admission were destroyed prior to the request. The fact of destruction was introduced into this case by the FBI itself, as the agency's original release of documents to plaintiff included an inventory worksheet indicating document serials which had been destroyed, as well as declaratory material explaining the destruction.

In the context of a FOIA action, we cannot order the FBI to make amends for any documents destroyed prior to the request because a FOIA request pertains only to material in the possession of the agency at the time of the request. *Kissinger v. Reporters Committee for Freedom of Press*, 445 U.S. 136, 151–52, 100 S.Ct. 960, 969, 63 L.Ed.2d 267 (1980); *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1363 (D.C.Cir.1983); *Badhwar v. Dep't of Air Force*, 629 F.Supp. 478, 481 (D.D.C.1986), *aff'd in part, vacated in part on other grounds*, 829 F.2d 182 (D.C.Cir.1987).

Plaintiff argues that the destruction is nonetheless relevant because there is a pattern in it centering on the period of his murder conviction. Plaintiff asserts that this pattern destroys the presumption of good faith that normally attends agency affidavits in FOIA actions and seeks discovery to pursue this issue. We cannot tell from the parties' submissions whether or not the FBI improperly destroyed any documents. Yet even if we credit plaintiff's claims, the only result is that the presumption of good faith falls from the agency's affidavits and summary judgment cannot be granted on their basis. This court has already reached that conclusion. We have conducted an *in camera* review of the augmented sample, scrutinizing the FBI's use of various exemptions to withhold material responsive to plaintiff's FOIA request, and we have found that the agency's withholdings were proper. Therefore, there remains no genuine issue of material fact concerning the destruction of documents in this case.

Plaintiff also requests discovery as to the exemptions claimed and the FBI's purpose in investigating him. Our *in camera* review of the exemptions as described above convinces us that the FBI has acted in good faith and has properly withheld responsive material.

As to the purpose behind the FBI's investigations of Harllel Jones and Afro Set, we found above that the operation met the law enforcement threshold for FOIA purposes despite any misconduct engaged in under its auspices. We therefore agree with the magistrate and the district court that discovery is not warranted on these issues either.

■ We are mindful of the difficulty plaintiffs face in litigating under FOIA, but a FOIA request is not a substitute for the normal process of discovery in civil and criminal cases. *John Doe Agency,* 493 U.S. at 153, 110 S.Ct. at 475–76; *Irons v. Bell,* 596 F.2d at 475 & n. 15 ("a criminal defendant or even a civil litigant may have rights of access [to records] not available to the general public under FOIA"). This point has already been well demonstrated in this case. During discovery related to his habeas petition, plaintiff was able to obtain certain materials which had been withheld under FOIA. This is as it should be. FOIA's scheme of exemptions does not curtail a plaintiff's right to discovery in related non-FOIA litigation; but neither does that right entitle a FOIA plaintiff to circumvent the rules limiting release of documents under FOIA.

\*  \*  \*  \*  \*  \*

For the reasons stated above, we AFFIRM the district court's grant of summary judgment to defendant.