*Browning v. State*, No. 272-5-14 Wncv (Teachout, J., December 10, 2014)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **Washington Unit** | **Docket No. 272-5-14 Wncv** |


**Cynthia Browning**
     **Plaintiff**


     **v.**


**State of Vermont**
     **Defendant**


### DECISION
### Cross-Motions for Summary Judgment

In 2011, legislation preparatory to and in anticipation of the eventual adoption of a "universal and unified health system" in Vermont, called Green Mountain Care, was enacted. 2011, No. 48. Among its many provisions, Act 48 directed the Secretary of Administration to present two sustainable financing plans for Green Mountain Care to the legislature by January 15, 2013. *Id*. § 9(a). Plaintiff Cynthia Browning, a member of the House of Representatives, dissatisfied that the administration had not by then come forward with such plans, in March 2014 submitted a public records request to Michael Costa, Deputy Director of Healthcare Reform, seeking his "reports or memos or other work products related to financing scenarios for Green Mountain Care." Mr. Costa produced some responsive materials, indicated that others did not exist, and withheld a third group under a claim of executive privilege. Ms. Browning appealed to Jeb Spaulding, Secretary of Administration, seeking the withheld documents only. Mr. Spaulding declined to release any of them, reasserting executive privilege. Ms. Browning then appealed to this court pursuant to 1 V.S.A. § 319(a).

Here, the State asserts executive privilege. It claims that the withheld documents were produced to assist the Governor in making policy decisions about financing options for Green Mountain Care and thus are privileged and exempt from disclosure under the Public Records Act.

*The Vermont Public Records Act and Executive Privilege*

Vermont's Public Records Act, 1 V.S.A. §§ 315–320, implements the strong policy favoring the public's right to examine public records. Exceptions to that right, *id*. § 317(c), are interpreted narrowly and the burden is on the agency opposing disclosure to prove that undisclosed records fall within an established exception. *Sawyer v. Spaulding*, 2008 VT 63, ¶ 8, 184 Vt. 545. Among others, records subject to statutory or common law privileges, other than the deliberative process privilege, are exempt from disclosure. 1 V.S.A. § 317(c)(4).

The Vermont Supreme Court recognized a form of executive privilege in *Killington, Ltd. v. Lash*, 153 Vt. 628 (1991). The privilege allows the Governor "to maintain the privacy of documents relating to the formulation of policy." *Id*. at 635. The *Killington* Court observed: "As objectionable as the image is of government conducted in secrecy's darkened chambers, it is hard to imagine a government functioning with no opportunity for private exchange among its ministers, with no moments of speculation, venturesome alternatives, or retractable words." *Id*. at 636–37. The privilege thus "protects and insulates the sensitive decisional and consultative responsibilities of the Governor which can only be discharged freely and effectively under a mantle of privacy and security." *Id*. at 636 (quoting *Nero v. Hyland*, 386 A.2d 846, 853 (N.J. 1978)). It does so, ultimately, for the benefit of the public. "It is not protection of governmental officials, but rather protection of the effectiveness of the overall governmental system that is at stake." *Killington*, 153 Vt. at 637.

The privilege is qualified; it is honored when the "interests of confidentiality" outweigh "those of disclosure." *Id*. at 638. The interests in documenting governmental wrongdoing or in gathering evidence essential to a fair trial, for example, weigh in favor of disclosure. Under the Public Records Act, the burden of justifying nondisclosure is on the agency. However, "[t]he function and meaning of [executive] privilege would be markedly altered if necessity for the information were to be presumed and the burden of overcoming the presumption of necessity were to be placed on the claimant of the privilege." *Id*. at 639. In this context, then, the presumption favors confidentiality rather than public access. While executive privilege is within the scope of 1 V.S.A. § 317(c)(4), the exception imports the allocation of burdens under the common law rather than relying on the scheme of burdens that otherwise applies under the Public Records Act.

Accordingly, when the executive branch self-certifies, *Killington*, 153 Vt. at 641, a basis for executive privilege, the burden switches to the person seeking disclosure to demonstrate need, *id*. at 539.[1] If a substantial need is established only then may the court review the documents to finally determine whether the balance of interests favors disclosure. *Id*.

Executive privilege also differs meaningfully from the deliberative process privilege that was expressly excluded from the group of exempt privileges under 1 V.S.A. § 317(c)(4) in 2006. 2005, No. 132 (Adj. Sess.), § 1. The deliberative process privilege, at common law, shields from disclosure agency records that are pre-decisional and deliberative in nature, but not those that are post-decisional or factual in nature. *New England Coalition for Energy Efficiency and*

---

[1] The parties have presented the issues in this case to the court using summary judgment procedure. V.R.C.P. 56. The State has supported its assertion of privilege with an index describing the withheld materials and the testimony of appropriate affiants explaining the basis for the privilege. Ms. Browning questions some of the statements in the affidavits, characterizing those matters as disputed. Ordinarily, of course, a material dispute of fact defeats summary judgment. In this regard, the law of executive privilege has an uneasy fit with ordinary summary judgment procedure. The self-certification process by which executive privilege is properly asserted relies to some extent on the executive branch's self-restraint. See *Killington, Ltd. v. Lash*, 153 Vt. 628, 641 (1990) (noting that "the insubstantial exercise of the privilege inevitably bears costs in credibility and public accountability, upon which each branch of government fundamentally relies"). In any event, in this case the nature of the withheld documents and the assertion of privilege are clear enough in the record that the court sees no need for findings of fact. The issues are fundamentally legal in character and can be decided on the summary judgment record.

*Environment v. Office of Governor*, 164 Vt. 337, 341 (1995).[2] The privilege is geared to the "regularized procedures of agency decisionmaking." *Id*. It is intended to facilitate effective administrative decisionmaking on policy matters while avoiding "secret rulemaking." *Id*.

The decisionmaking of the chief executive is different in nature from ordinary administrative decisionmaking, and so is the privilege that protects it.

> The decision-making process of the chief executive is not prescribed by statute, nor does it consist of regularized procedures. The public does not have the same interest in examining the internal workings of the process. Moreover, because the chief executive has a range of consultative and decisional responsibilities not easily separated into discrete decisions, predecision and postdecision line-drawing would be an arbitrary exercise.

> . . .

> A chief executive properly receives advice on important issues facing the state, even though no immediate decision may be required. The need for honest and open communication between the chief executive and advisors remains.

*Id*. at 341–42. The fundamental issue with executive privilege is merely whether the requested documents are "primarily advisory" in nature. *Id*. at 343. A prima facie case is made if the responsible executive official "identif[ies] the documents for which the privilege is claimed, and explain[s] why the documents are protected by the privilege." *Id*. at 344. Such an explanatory affidavit in *New England Coalition* was sufficient because it indicated that the withheld documents were "confidential and advisory, and contain policy and legal advice." *Id*. at 345.

*The withheld documents*

Michael Costa is the Deputy Director of Health Care Reform. His "primary responsibility is to advise the Governor on public financing options for Green Mountain Care." Affidavit of Michael Costa ¶ 3. He also reports to the Governor's other senior advisors. In responding to Ms. Browning's records request, he withheld as privileged 17 documents at the Governor's direction. *Id*. ¶ 8. The withheld documents include excerpts from eight "weeklies" and nine "slide decks" from PowerPoint presentations. All are described generally in an index provided by the State and in the affidavits of Michael Costa and Jeb Spaulding. Weeklies are "reports to the Governor from department and agency heads." *Id*. ¶ 11. The withheld excerpts were authored by Mr. Costa and all "relate to [his] progress and interim advice and recommendations on the health care financing issue." *Id*. They have been treated as

---

[2] "Predecisional documents are generally viewed as part of the 'agency "give-and-take" leading up to a decision,' while postdecisional documents frequently 'represent the agency's position on an issue, or explain such a position, and thus may constitute the "working law" of an agency.' While the quality of agency decisions is maintained by protecting 'the ingredients of the decisionmaking process' from disclosure, communications that follow the decision, explaining or implementing it, do not raise the same concerns for candor and frank discussion. Moreover, the public has a greater interest in learning the actual decision of the agency, and the reasons for it, than in discovering the policies and arguments that were rejected." *New England Coalition for Energy Efficiency and Environment v. Office of Governor*, 164 Vt. 337, 341 (1995) (citations omitted).

3

confidential. *Id.* The withheld slide decks contain Mr. Costa's "preliminary analyses and progress to date on the health care financing issue." *Id.* ¶ 12. They were used in presentations to the Governor and others acting in a confidential, advisory capacity to the Governor. *Id.*

*Prima facie case of executive privilege*

On this record, the State has easily satisfied the initial burden of coming forward with a basis for the assertion of executive privilege. The withheld documents were authored by Mr. Costa, whose principal role is to advise the Governor on policy issues related to the funding of Green Mountain Care. The documents all address that subject matter, have been used to facilitate the development of policy, whether directly with the Governor or with others in positions advisory to the Governor, and have been treated as confidential.

*Ms. Browning's arguments*

Ms. Browning argues that (1) the State's index is incomplete and those documents that describe Mr. Costa's progress or "efforts" rather than recommendations are not privileged; (2) as a legislator and member of the public with healthcare financing expertise, Ms. Browning has adequate, specialized needs for the withheld materials; (3) Act 48 required production of the administration's financing plans long ago and weighs in favor of releasing Mr. Costa's work product now; and (4) in any event, the privilege should be treated as waived because the records were shared with individuals who are not senior or specially appointed advisors.

*Description of the withheld documents*

Ms. Browning argues that the State's *Vaughn* index is incomplete because it does not explain why each particular document is privileged. She also argues that some documents are alleged to describe unprivileged progress or "efforts" by Mr. Costa rather than privileged recommendations and deliberations.

"A *Vaughn* index is a routine device through which the defendant agency describes the responsive documents withheld or redacted and indicates why the exemptions claimed apply to the withheld material." *Jones v. F.B.I.*, 41 F.3d 238, 241 (6th Cir. 1994) (citing *Vaughn v. Rosen*, 484 F.2d 820, 826–27 (D.C. Cir. 1973)). In this case, the State provided an index describing the withheld materials item-by-item, including date, description, author, and audience, and described the basis for withholding them in separate affidavits. The withheld materials and basis for nondisclosure are clear. The index itself and the related affidavits set forth in content and manner of presentation a sufficient basis for the assertion of the privilege. Further detailed description or explanation is not necessary. No Vermont authority requires an agency to spell out an asserted basis for nondisclosure in an index when doing so is not helpful. See, e.g., *Rutland Herald v. Vermont State Police*, 2012 VT 24, ¶ 10 n.2, 191 Vt. 357 (declining to require production of a *Vaughn* index at all when doing so is neither "necessary" nor "helpful").

The State's description of the withheld documents makes clear that they relate directly to the development of the administration's health care finance policy, that they have been treated as confidential, and that they pertain to the Governor's consultative and decisional responsibilities.

*Ms. Browning's interests in the withheld materials*

Ms. Browning argues that even if the withheld records are privileged, they nonetheless should be disclosed because she has specialized needs for them. These include her desire to more fully participate as a member of the public, as a legislator, and as an individual with relevant expertise in the development of the policy issues the documents address, and her interest in sharing the material with an expert hired by the legislature who is addressing the same subject matter.

The Court has described the sort of needs that tend to support disclosure as uncovering governmental wrongdoing or gathering evidence that is essential to a fair trial. Even evidence of that character does not compel disclosure; it merely weighs in favor of it. Here, Ms. Browning's purported need for Mr. Costa's work product does not distinguish her from any member of the public, the legislature, or those individuals with expertise in health care financing issues. She merely wishes to more fully participate in development of this policy, or assist the legislature's own expert in doing so, with the benefit of Mr. Costa's work and the Governor's thought process. Such generalized interests do not materially weigh in favor of disclosure

*Section 9 of Act 48*

Ms. Browning also argues that, under § 9 of Act 48, the administration already is long overdue in presenting its financing plans to the legislature and the public. Section 9 directed the Secretary of Administration to present two sustainable financing plans for Green Mountain Care to the legislature by January 15, 2013. According to Ms. Browning, the Secretary did not do so and still has not done so. Ms. Browning cites to § 9 as evidence that all concerned anticipated knowing the administration's healthcare financing plans long before now. She suggests that this weakens any claim of privilege or supersedes it entirely.

Section 9 clearly anticipated that the administration would present two alternative health care financing proposals at the beginning of 2013. To the extent that the administration has not done so, the record includes neither an explanation for the delay nor an allegation that such proposals have been finalized but withheld from the legislature and the public.

The issue in this case, however, is the propriety of the Governor's exercise of executive privilege, not enforceability of the deadline in § 9. Nothing in Act 48 suggests that the mandate of § 9 was intended to undermine an otherwise legitimate claim of executive privilege and now should be construed to overtake the Governor's deliberations. Executive privilege has both "constitutional and common-law roots" and "is closely linked to the separation of powers." *New England Coalition for Energy Efficiency and Environment v. Office of Governor*, 164 Vt. 337, 345 (1995). While the timeline in § 9 may explain to some extent one's frustration if the policy debate over health care financing seems delayed or otherwise stalled, it does not alter the analysis of a claim of executive privilege. Again, the ultimate purpose of allowing the Governor this privilege is the public good. This is so even when there are "inconsistencies between public statements and the internal decision-making process." *Id.* at 342. The privilege prevails "because the chief executive has a range of consultative and decisional responsibilities not easily separated into discrete decisions." *Id.* at 341–42.

5

*Waiver*

Finally, Ms. Browning argues that any claim of privilege has been waived because the withheld documents were shared with legislators and members of business and consumer advisory committees who are not senior members of the administration or specially appointed advisors. In essence, she claims that the administration already has shared the documents publicly and they have lost what confidentiality they may have had.

Aside from the Governor and high-level members of the administration, some of the withheld materials were shared with particular legislators with relevant policy or political expertise and members of the Governor's Business Advisory Council on Health Care Financing, established by Executive Order No. 03-13, and the Governor's Consumer Advisory Council on Health Care Reform, established by Executive Order No. 01-14. The members of each Council are appointed by and serve at the pleasure of the Governor. The purpose of each Council is to "provide the Governor with advice and information on health care reform." These Councils are specifically exempt from the state's open meeting law: the definition of "public body" subject to the open meeting law states that the term "means any board, council, . . . except that 'public body' does not include councils or similar groups established by the Governor for the sole purpose of advising the Governor with respect to policy." 1 V.S.A. § 310(3). Presumably the purpose of this shield of confidentiality is the same as the policy of executive privilege: to promote the free exchange of information and ideas between the Governor and those who advise him on policy matters.

 As one court has explained,

> Presidential advisers do not explore alternatives only in conversations with the President or pull their final advice to him out of thin air—if they do, their advice is not likely to be worth much. Rather, the most valuable advisers will investigate the factual context of a problem in detail, obtain input from all others with significant expertise in the area, and perform detailed analyses of several different policy options before coming to closure on a recommendation for the Chief Executive.

*In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997). Communications between administration officials and these others may properly fall within the scope of executive privilege. See *id*. at 749–52.

In this case, the court perceives no waiver or sharing of withheld materials that would undermine the claim of privilege. Certain legislators and the members of the Councils with whom withheld materials were shared may not be as close to the Governor's decisionmaking process as high-level members of his administration. However, they certainly had an "*operational* proximity" to him with regard to their advisory role in the development of healthcare financing policy. *Association of American Physicians and Surgeons, Inc. v. Clinton*, 997 F.2d 898, 910 (D.C. Cir. 1993). The materials were shared with them for that purpose and have been treated as confidential. The privilege applies in these circumstances.

6

*Conclusion*

The State has made a prima facie case that the materials requested by but withheld from Ms. Browning are within the executive privilege because they directly reflect on the Governor's decisional and consultative responsibilities. Ms. Browning has not come forward with a need for access that materially weighs in favor disclosure. There thus is no need to review the withheld documents *in camera*. The executive branch had discretion to withhold the documents under executive privilege and 1 V.S.A. § 317(c)(4).

**ORDER**

For the foregoing reasons, the State's motion for summary judgment is *granted*; Ms. Browning's is *denied*.

Dated at Montpelier, Vermont this _____ day of December 2014.

_____
Hon. Mary Miles Teachout,
Superior Judge