RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0136p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

ENERGY AND POLICY INSTITUTE,

*Plaintiff-Appellant*,

*v.*

TENNESSEE VALLEY AUTHORITY,

*Defendant-Appellee*.

Nos. 24-6134/25-5111

─────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:22-cv-00220—Thomas A. Varlan, District Judge.

Argued: October 23, 2025

Decided and Filed: May 8, 2026

Before: KETHLEDGE, LARSEN, and BLOOMEKATZ, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Allison Kole, ENERGY AND POLICY INSTITUTE, El Verano, California, for Appellant. Lane E. McCarty, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Allison Kole, Zehava Robbins, ENERGY AND POLICY INSTITUTE, El Verano, California, Chris Irwin, Knoxville, Tennessee, for Appellant. Lane E. McCarty, David D. Ayliffe, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee. Mahesha P. Subbaraman, SUBBARAMAN PLLC, Minneapolis, Minnesota, O.W. "Terry" Bussey, SOUTHERN ENVIRONMENTAL LAW CENTER, Nashville, Tennessee, for Amici Curiae.

─────────────

## OPINION

─────────────

LARSEN, Circuit Judge. Watchdog organization Energy and Policy Institute (EPI) sought documents concerning industry groups and an insurance policy from the Tennessee

Valley Authority (TVA) under the Freedom of Information Act (FOIA).  TVA released some documents, partially redacted some, and withheld others.  EPI sued.  In the course of litigation, TVA released more documents.  The district court granted summary judgment to TVA on the remaining documents.  EPI sought fees for its role in securing the mid-litigation release of documents, which the district court denied.  EPI appeals both the grant of summary judgment and the denial of fees.  We AFFIRM in part, REVERSE in part, and REMAND for further proceedings.

I.

Congress created the Tennessee Valley Authority in 1933 to electrify the Appalachian South.  Tennessee Valley Authority Act, Pub. L. No. 73-17, 48 Stat. 58 (1933).  TVA is at once an agency, authorized to exercise eminent domain, exempt from the typical rate regulations set by the Department of Energy, and subject to FOIA; and a private corporation (whose shares are entirely owned by the United States) that receives no taxpayer funding.  *Id.*  TVA has been known to consult with other electric utilities to strategize about compliance with EPA's Clean Air Act regulations.  Plaintiff Energy & Policy Institute, a public interest group, suspects that TVA does more than that, perhaps funding lobbying and litigation efforts through two industry groups, the Climate Legal Group and the Power Generation Air Coalition (PGen), both presently coordinated by the law firm McGuireWoods.  EPI submitted FOIA Request 109 for materials pertaining to TVA's communications with those two groups.  In time, EPI also became interested in a contract between TVA and its insurance provider, AEGIS, thinking that the contract would shed light on just how risky TVA understands its remaining coal-fired power plants to be and the effect of that risk on energy prices in the Tennessee Valley.  EPI sought that document in Request 208.

TVA initially provided some of the requested documents, but it withheld many others and redacted most of the documents it did provide.  It justified its withholdings and redactions under FOIA Exemptions Four (protecting a third party's confidential commercial information submitted to an agency); Five (protecting material that would be shielded from discovery in a civil case); and Six (protecting private personnel information).  EPI administratively appealed those determinations, and TVA upheld its withholdings.  So EPI filed suit in the Eastern District

of Tennessee, first challenging the withholdings in Request 109 and then amending the complaint to include Request 208.

TVA provided a "*Vaughn* index," detailing the content of each document and the rationale for the withholdings.[1]  While preparing its *Vaughn* index, McGuireWoods indicated to TVA that it no longer objected to the release of certain documents that TVA had previously withheld under Exemption Four.  TVA then released those documents.  The district court, satisfied with the *Vaughn* index as amended, granted summary judgment to TVA.  EPI filed a notice of appeal and moved for attorneys' fees on the basis of the documents TVA released after the filing of this lawsuit.  The district court denied the fees motion on the ground that EPI had not "substantially prevailed" within the meaning of 5 U.S.C. § 552.  EPI then filed a notice of appeal on that denial.

II.

EPI first appeals the district court's grant of summary judgment with respect to TVA's withholdings.  In this posture, our review is de novo, *Cincinnati Enquirer v. Dep't of Just.*, 45 F.4th 929, 932 (6th Cir. 2022), and TVA holds the burden of justifying its withholdings under FOIA's exemption framework, *ACLU v. Dep't of Just.*, 655 F.3d 1, 5 (D.C. Cir. 2011).  It may carry this burden by submitting a *Vaughn* index or affidavits attesting to the content of the withheld documents and the basis on which they are withheld. *Rimmer v. Holder*, 700 F.3d 246, 255 (6th Cir. 2012).  "[T]hese affidavits are entitled to a presumption of good faith absent evidence to the contrary." *Id.*  Where some portion of a document is exempted from disclosure and some is not, the agency must release "[a]ny reasonably segregable portion of [the] record." 5 U.S.C. § 552(b).  And even where information falls within the scope of a FOIA exemption, recent amendments permit withholding "only if . . . the agency reasonably foresees that

---

[1]"Courts frequently decide FOIA cases through the use of a '*Vaughn* index.'  'A *Vaughn* index is a routine device through which the defendant agency describes the responsive documents withheld or redacted and indicates why the exemptions claimed apply to the withheld material.'" *S. Appalachian Biodiversity Project v. U.S. Forest Serv.*, 500 F. Supp. 2d 764, 768 (E.D. Tenn. 2007) (quoting *Jones v. FBI*, 41 F.3d 238, 241 (6th Cir. 1994)).  "*In camera* review of the disputed documents is unnecessary if the *Vaughn* index provides adequate detail and justification." *Id.* (citing *Jones*, 41 F.3d at 243).

disclosure would harm an interest protected by an exemption" or if disclosure is otherwise "prohibited by law." *Id.* § 552(a)(8)(A)(i).

A.

Exemption Four provides that FOIA's presumption of disclosure "does not apply to matters that are" "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Accordingly, three questions present themselves in an Exemption Four dispute: whether the information is "(1) commercial or financial" in nature, "(2) obtained from a person" rather than generated by the agency, and "(3) privileged or confidential." *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983). The "interest[s] protected by [this] exemption," 5 U.S.C. § 552(a)(8)(A)(i), "include providing private parties with sufficient assurances about the treatment of their proprietary information so they will cooperate in federal programs and supply the government with information vital to its work," *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019).

*1. The information is "commercial" in nature.* The inquiry under the first prong focuses on the nature of the submitted information rather than the identity of the submitting party—"not every bit of information submitted to the government by a commercial entity qualifies for protection." *Pub. Citizen*, 704 F.2d at 1290. The ordinary meaning of "commercial" is "[o]f or pert[aining] to commerce," or "[h]aving financial profit as the primary aim." *Commercial*, Webster's New International Dictionary (2d ed. 1961); *see also Commercial*, Black's Law Dictionary (4th ed. 1968) ("[r]elating to or connected with trade and traffic or commerce in general"). Other circuits agree that information is "commercial" or "financial" where it "in and of itself has a commercial nature or serves a commercial function," *Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*, 58 F.4th 1255, 1262–68 (D.C. Cir. 2023), or it "pertain[s] or relat[es] to or deal[s] with commerce," *Bloomberg L.P. v. U.S. Postal Serv.*, 118 F.4th 307, 317 n.2 (2d Cir. 2024). For instance, information that "reveal[s] basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate[s] to the income-producing aspects of a business" falls within the exemption. *Pub. Citizen*, 704 F.2d at 1290.

On appeal, EPI challenges the commercial nature of 102 documents withheld from Request 109[2] and the redacted portions of the insurance contract sought in Request 208.

*Request 109.*  Three categories of information are in dispute.  First, EPI seeks disclosure of "CLG Updates" provided to members.  These emails "consist[] of a selection of subjects which may be generally described as climate-related regulatory and litigation developments in which CLG members have a common interest and for which CLG counsel was retained to provide . . . legal advice, analysis and guidance."  R. 46, Jaber Decl., PageID 879.  These emails "general[ly]" contain a description of a recent industry development together with "legal analysis."  *Id.*  EPI argues that the Updates are not "commercial in their own right."  Appellant Br. at 23.  We disagree.  We understand this material to be "commercial . . . in and of itself" because "it serves a commercial function."  *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002) (citation modified).  It is undisputed that "records that actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business" are "commercial."  *Pub. Citizen*, 704 F.2d at 1290.  Beyond *revealing* basic commercial operations, the CLG operations *are* the "commercial product" offered by McGuireWoods.  R. 46, Jaber Decl., PageID 881.  If anything is "commercial," it is the objects of commerce themselves.  *See, e.g.*, *Ctr. for Inquiry, Inc. v. Dep't of Health & Hum. Servs.*, 723 F. Supp. 3d 47, 60 (D.D.C. 2024) (concluding that the content of a monograph was properly withheld under Exemption Four as "the very product from which [submitter] derives most of its income").  The disclosure of McGuireWoods' confidential legal advice would foreseeably harm the firm's ability to attract customers who would otherwise pay for access to that expertise.[3]

---

[2]These are thirty-seven CLG Updates (Doc. Nos. 001, 006, 011, 017, 021, 025, 029, 091, 102, 209, 219–221, 223, 227, 231, 234, 235, 238, 240, 247, 255, 258, 265, 274, 281, 284, 287, 291, 297, 305, 310, 315, 318, 323, 328, & 334), two other email discussions about CLG (Doc. Nos. 028 & 035), fifty-six documents with PGen recruitment information and other materials (Doc. Nos. 030–32, 041–43, 048, 053, 061, 062, 063, 071, 072, 077, 078, 080, 082–85, 089, 090, 098, 103, 105, 109, 119, 122–27, 129, 130, 132–35, 136–39, 153–56, 167–69, 184, 185, 356, 359, 361, 362), and seven documents where Exemption Four is applied to the names of CLG and PGen's corporate members and those corporations' representatives (Doc. Nos. 067, 068, 163, 179, 349, 353, & 365). Appellant Br. at 20 n.3.

[3]The same rationale applies to TVA's withholding of what EPI refers to as "PGen recruitment information and other materials," Appellant Br. at 20 n.3, such as information on the proposed group's "structure, governance, budget and dues," as well as retention negotiations between TVA and McGuireWoods on a Clean Air Act matter.

Second, EPI seeks information related to the membership of CLG and PGen: membership lists themselves, business email addresses of member representatives, and discussions concerning the addition of new members to those groups. This information is also "commercial." For McGuireWoods, the "person" from whom the information was "obtained," these are client lists and discussions about client recruitment. Again, we have little difficulty in concluding that client lists are sufficiently similar to "sales statistics" or "inventories" in "relat[ing] to the income-producing aspects of a business" to qualify as "commercial." *Pub. Citizen*, 704 F.2d at 1290; *see also Greenberg v. FDA*, 803 F.2d 1213, 1216 (D.C. Cir. 1986) (concluding that customer lists were "commercial"). And, as above, foreseeable commercial harm in a competitive market for legal advice would flow from disclosing McGuireWoods' client lists, prospective clients, and decision-making process in client recruitment.

Finally, EPI seeks various pieces of logistical information related to McGuireWoods' dealings with CLG and PGen: emails seeking to schedule a meeting (Doc. Nos. 028 & 362), discussion of how "McGuireWoods would communicate with members" (Doc. Nos. 070, 137, 138) or utilize "eRoom notifications" (Doc. No. 085), emails about choosing a name for PGen (Doc. Nos. 048, 083, 084), and further unspecified discussion of the "internal operations of PGen" (Doc. Nos. 356, 359, & 361). R. 46, Jaber Decl., PageID 898–92. Though this information may be "commercial" in superficially the same sense as the legal advice discussed above—scheduling meetings or choosing a client communication system are tasks that law firms do for money—we have difficulty ascertaining what harm would result from their disclosure. For instance, though "eRoom" is a "proprietary platform of McGuireWoods," TVA's proffered declaration does not explain how an email indicating McGuireWoods' intent to "utilize" that platform would compromise any commercial interest of the firm or dilute a competitive advantage. *Id.* at 898–99. The same is true of "strategi[ies]" for emailing clients or discussion of why PGen's name was chosen. *Id.* at 898, 890. The substance of these documents, with any other protected material appropriately redacted, should not have been withheld under Exemption Four.

---

R. 45-1, *Vaughn* Index, PageID 832, 842. The creation of PGen is one of the legal services McGuireWoods provides to its clients, as is legal advice on compliance with the Clean Air Act. Accordingly, the details of those services are commercial information whose release would foreseeably harm the firm.

*Request 208.*   With respect to Request 208, EPI challenges the commerciality of the provisions of TVA's insurance policy with AEGIS.  But "dates of coverage" or "list[s] of TVA facilities covered," Appellant Br. at 51, are heartland "commercial" information in the same sense that McGuireWoods' legal advice was.  This information concerns the details of the very product that AEGIS provides, the disclosure of which would foreseeably harm AEGIS's commercial interests by indirectly revealing its proprietary risk assessments necessary to underwrite TVA.  *See* R. 36, Gaffney Decl., PageID 541–43.  This remains the case even after the policy has lapsed because the same risk pricing information, even if a few years old, would still be useful where the underlying practices and machinery at the insured facilities have not changed.  *See id.*   And this remains true even though AEGIS appears not to have current, meaningful competition in the power plant insurance market; indirectly revealing details of AEGIS's risk analysis lowers the cost of entry for firms who would potentially compete.  This information is properly "commercial" within the meaning of Exemption Four.

One exception.  TVA also redacted the name of the AEGIS representative who negotiated the insurance policy.  And it articulated an Exemption Four rationale for this withholding, rather than the more common Exemption Six basis for withholding the names of individuals.  TVA's brief does not respond to EPI's argument that Exemption Four does not justify this withholding.  When asked about the issue at argument, TVA foreswore reliance on Exemption Six and offered no defense of this information's commerciality other than that "the submitter said it was confidential commercial information."  Oral Arg. at 24:55–25:35.  The affidavit from the Vice President of AEGIS's underwriting division does not mention the redaction of the name or provide any additional basis for redaction.  *See* R. 36, Gaffney Decl., PageID 541–46.  And we do not see how the name of the negotiating employee is "commercial."  Accordingly, this redaction was unsupported by law.

2. *The information is "obtained from a person."*  Exemption Four exists to protect the information of private parties in the government's possession.  So, "'[p]erson' includes an individual, partnership, corporation, association, or public or private organization other than an agency."  5 U.S.C. § 551(2).  Naturally, then, information generated by the agency itself is not "obtained from a person." *Bd. of Trade of City of Chi. v. Commodity Futures Trading Comm'n*,

627 F.2d 392, 404 (D.C. Cir. 1980).   In practice, this distinction is not always as neat as it appears. What should we make of an agency's summary or reformulation of a private person's information?  Two sister circuits have held that such information remains subject to Exemption Four.  *See OSHA Data/C.I.H., Inc. v. Dep't of Lab.*, 220 F.3d 153, 162 n.23 (3d Cir. 2000); *Gulf & W. Indus., Inc. v. United States*, 615 F.2d 527, 529–30 (D.C. Cir. 1979).   But when information has been "*substantially* reformulated by the agency," it might cease to fall under Exemption Four.  *S. All. for Clean Energy v. Dep't of Energy*, 853 F. Supp. 2d 60, 68 (D.D.C. 2012) (emphasis added).

*Request 109.*  EPI argues that TVA failed to carry its burden to demonstrate that thirteen documents in Request 109 were "obtained from a person."**4**  Some of these documents appear to have been emails with documents "drafted by [McGuireWoods] and revised in response to member comments."  R. 46, Jaber Decl., PageID 889–90 (discussing Doc. Nos. 040, 041, 058, 078, 122, 126, & 127).  Other documents appear to be emails "between PGen counsel and PGen members" about the formation and budget of PGen and the confidentiality provisions its members would be subject to.  *Id.* at 891 (discussing Doc. Nos. 153–56), 894 (discussing Doc. Nos. 129 & 130).   TVA seeks to safeguard two categories of information in these withholdings:  (1) the actual contents of the emails and attached documents and (2) the names of PGen members or potential members.  *Id.*  EPI's attack on the withholdings turns on the possibility that TVA was one of the PGen members who replied to these emails or who made the comments that spurred revisions.

We conclude that the withholdings remain proper even if TVA was one of the contributing PGen members because the information involved would not be reasonably segregable from the protected information.  If TVA provided the comments that spurred revisions, the content of those comments would almost certainly reveal the content of the draft from counsel being commented on.  The same is true for emails replying to confidential work by McGuireWoods.  The revisions, too, even if based on TVA's input, remain the work of McGuireWoods absent some good reason to believe that they reflect TVA's "substantial[] reformulat[ion]" of the initial draft without meaningful input from McGuireWoods in

---

**4**These are Doc. Nos. 040, 041,058, 078, 122, 126, 127, 129, 130, & 153–56.  Appellant Br. at 21 n.4.

implementing the changes.  *Cf. S. All.*, 853 F. Supp. 2d at 68.  On the record before us, we have no reason to come to that conclusion.  Finally, the email addresses of PGen members or potential members in the address line of an email *reply* by TVA cannot be said to have been "substantially reformulated" by TVA; that information remains "obtained from a person" outside the agency.

*Request 208.*  Here, EPI argues that some of the withheld contract terms may have been "substantially reformulated" by the agency in the course of negotiations.  But EPI does not appear to have raised this argument below.  And, even if it had, and even if some of the terms were substantially changed at the agency's direction, that information would not be reasonably segregable from the underlying confidential risk assessment information that AEGIS wishes to protect.  Indeed, information about the course of dealing may present a *greater* risk of exposing AEGIS's pricing judgments.  This information remains within the protection of Exemption Four.

3.  *The information is "confidential."*  The Supreme Court recently made clear that "confidential" means at least any information that is "both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy."  *Argus Leader*, 588 U.S. at 440.  The former is a necessary condition for confidentiality.  *Id.* at 434–35.  And though the Court declined to decide whether the latter was necessary, the two are jointly sufficient.  *Id.*  Because TVA entered into confidentiality agreements with all relevant parties, we likewise reserve this question for another day.

*Request 109.*  EPI makes two arguments with respect to the documents it challenges under this prong.[5]  First, EPI argues that TVA provided insufficient evidence that the CLG Updates and communications with PGen members were kept confidential.  EPI contrasts the sworn statements here that the Updates were provided to "CLG" or "PGen" without listing the number of corporate or individual recipients with the testimony in *Argus Leader* that the information there had been shared with "only small groups of employees."  588 U.S. at 434.  But the sworn statements provided, coupled with the confidentiality provisions in CLG's bylaws and

---

[5]Specifically, EPI denies that the CLG Updates (Doc. Nos. 001, 006, 011, 017, 021, 025, 029, 091, 102, 209, 219–21, 223, 227, 231, 234, 235, 238, 240, 247, 255, 258, 265, 274, 281, 284, 287, 291, 297, 305, 310, 315, 318, 323, 328, & 334), the names of PGen members (in Doc. Nos. 030–32, 041–43, 048, 053, 061–63, 071, 072, 077, 078, 080, 082–85, 089, 090, 098, 103, 105, 109, 119, 122–27, 129, 130, 132–39, 153–56, 167–69, 184, 185, 356, 359, 361, 362), and "other CLG material" (Doc. Nos. 035 & 038) are confidential.  Appellant Br. at 21 n.5.

PGen's procedural agreements, convince us that McGuireWoods and its correspondents treat this information as confidential.  It would make little sense for either McGuireWoods or industry group members to be cavalier with costly legal advice they believe will provide a competitive edge.  And EPI's attempt to analogize to *Farmworker Justice v. Department of Agriculture*, 2021 WL 827162 (D.D.C. Mar. 4, 2021), is similarly unsuccessful.  There, the court found that information ceased to be "confidential" when distributed to 265,000 families.  *Id.* at \*2.  TVA represented to the court at oral argument that CLG has eight corporate members and PGen sixteen.  So the analogy fails.

Second, EPI argues that some of the contested information has been publicly disclosed and hence cannot be "confidential."  EPI points out that the names of PGen's members appear to be publicly available, and TVA does not claim otherwise.  *See* PGen Home Page, https://pgen.org (last visited Mar. 26, 2026) (presenting the hyperlinked brand marks of member companies in large type on the organization's home page).  TVA appears to have withheld or redacted twenty-seven documents because they list *potential* members of PGen.[6]  If by "potential PGen members," TVA means entities who did not ultimately join PGen, the withholding or redaction was proper.  But if TVA also includes current members in this group, those names are no longer confidential and thus no longer protected by Exemption Four.  On remand, the district court should direct TVA to clarify this ambiguity and comply with its disclosure obligations accordingly.

*Request 208*.  EPI argues that the insurance policy is not confidential because public utility commissions have disclosed similar AEGIS policies, and AEGIS itself has publicly disclosed sample policies for potential customers.  But none of this demonstrates that the information sought to be protected here—risk pricing information specific to TVA—is not

---

[6]Some were redacted solely to hide the names of potential PGen members (Doc. Nos. 062 & 135).  R. 45-1, *Vaughn* Index, PageID 836, 46.  Some were withheld in full because that information was deemed non-segregable (Doc. Nos. 031 & 048).  *Id.* at 832, 834.  One was redacted to hide both the names of potential PGen members (Doc. No. 356) and other information.  *Id.* at 869.  More were withheld in full to hide both those names and other confidential information (Doc. Nos. 030, 032, 061, 071, 072, 077, 083, 084, 103, 105, 119, 123–25, 129, 130, 132–34, 168, 169, & 184).  *Id.* at 832–54.  By far, the most common additional basis is a nondescript claim of "information communicated by McGuireWoods to the [potential members]."  *Id.*  Still, these are generous readings of the *Vaughn* index, as a repeated typo omits "potential PGen members" from otherwise identical explanations that the confidential commercial information consists of the "identit[y/ies] (from employee email adresses [sic]) of [potential PGen members]."  *Id.*

confidential.  TVA and AEGIS's practice of entering nondisclosure agreements when negotiating the policy, and the sworn attestation that the specific withheld information is treated as confidential, suffice to convince us that the information was properly withheld under Exemption Four.

B.

Exemption Five protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested."  5 U.S.C. § 552(b)(5).  Although this provision by its terms encompasses any basis for withholding material that could be asserted in litigation, by the time the district court decided the summary judgment motion, TVA relied only on an assertion of attorney-client privilege.  And the district court declined to address the assertion of this privilege because it concluded that TVA had invoked Exemption Five only with respect to documents for which it also claimed Exemptions Four and Six.  Because the district court held that these documents were properly withheld or redacted under the latter exemptions, and because the Exemption Five assertions all "rais[ed] similar and coextensive arguments" over the same material, the district court concluded that it need not address either the substance of Exemption Five or any segregability concerns that followed from ignoring it.  R. 48, Op. & Order, PageID 957.

As EPI points out, and TVA concedes, that's not quite right.  Three documents, Nos. 113, 115, & 116, were produced with redactions justified solely on the basis of attorney-client privilege under Exemption Five.  *See* R. 45-1, *Vaughn* index, PageID 843–44.  Those documents are emails discussing a draft contract with McGuireWoods for legal services.  *Id.*  EPI clarifies that it challenges those redactions only to the extent that they "consist of business negotiations between TVA and McGuireWoods."  Reply Br. at 16 n.4.  As we read the *Vaughn* index, however, these emails do not involve such negotiations.  In each of the documents, TVA redacted "a discussion of McGuireWoods' commercial proposal to TVA" under Exemption Four.  R. 45-1, *Vaughn* index, PageID 843–44.  The Exemption Five redactions concerned only "communications and legal interpretations . . . regarding certain contractual provisions."  *Id.*  The

"business negotiation[]" material EPI seeks falls much more naturally into TVA's description of its Exemption Four redactions, and EPI has not challenged that application. So no dispute presents itself for our resolution.[7]

Nor was the district court's segregability analysis erroneous. As EPI rightly notes, permissible assertions of attorney-client privilege are fairly narrow in the FOIA context. *See Falcone v. Internal Revenue Serv.*, 479 F. Supp. 985, 989 (E.D. Mich. 1979); *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 253–54 (D.C. Cir. 1977). Indeed, it is largely for that reason that the privilege assertions EPI now attacks—over, say, the CLG Updates or material designated as confidential by the group bylaws—feature information that fits neatly within the broader Exemption Four withholdings that we have already upheld.

Finally, EPI's Reply Brief asks us to address TVA's earlier assertion of the government confidential commercial information privilege under Exemption Five. TVA eventually withdrew this rationale for its withholdings despite having asserted it for more than two years. EPI contends that the issue is not moot because TVA might wrongfully assert the privilege in future requests, only to again withdraw it before an Article III tribunal. EPI says this makes the issue "capable of repetition, yet evading review." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998). We disagree. Even if there were "a reasonable expectation" that EPI would "be subject to the same action again," the "challenged action" here is not "too short to be fully litigated prior to cessation or expiration." *Id.* (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990)). So this is not the kind of "exceptional situation" that calls for a departure from the mootness doctrine. *Id.* (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)).

If EPI meant instead to invoke the "voluntary cessation" doctrine, that doctrine does not apply in this posture. A plaintiff who pursues an injunctive claim against "an agency *policy or*

---

[7]Earlier, we held that some information related to the names of current PGen members was wrongfully withheld under Exemption Four. *See supra* Part II.A.3. Two of those documents—Nos. 032 & 129—feature parallel Exemption Five bases for withholding in addition to assertions of Exemption Four over "PGen recruitment information" that we concluded was properly withheld. Because we do not understand the *Vaughn* index to describe an assertion of attorney-client privilege over the names of current PGen members, we need not decide whether that assertion is proper. *See also S.S. v. Leatt Corp.*, 2014 WL 356938, at *6 (N.D. Ohio Jan. 31, 2014) ("[T]he attorney-client privilege does not protect the fact that an individual sought legal advice."); *accord Methode Elecs., Inc. v. Finisar Corp.*, 205 F.R.D. 552, 556 (N.D. Cal. 2001).

*practice*" of wrongfully evaluating FOIA requests may continue to pursue *that* remedy even after the specific documents sought have been released. *Payne Enters., Inc. v. United States*, 837 F.2d 486, 490–92 (D.C. Cir. 1988) (emphasis added); *see also* R. 19, Am. Compl., at 9 (not seeking such relief). Outside of those circumstances, however, "once all requested records are surrendered, federal courts have no further statutory function to perform"—"however fitful or delayed the release of information under the FOIA may [have] be[en]." *Payne Enters.*, 837 F.2d at 490–92 (quoting *Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982)).

C.

Exemption Six protects "personnel and medical files and similar files[,] the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). We have read this to "establish[] a two-prong inquiry: (1) whether the file includes personnel, medical, or 'similar' data' and (2) if so, whether disclosure constitutes a 'clearly unwarranted' invasion of privacy." *Rugiero v. Dep't of Just.*, 257 F.3d 534, 550 (6th Cir. 2001) (citations omitted). The first prong presents a low bar. "[T]he phrase 'similar files'" has "a broad, rather than a narrow, meaning." *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600 (1982). Any "detailed Government records on an individual which can be identified as applying to that individual" or "information which applies to a particular individual [in] Government records" qualifies. *Id.* at 602. Though broad, this inquiry is not reducible to the second prong— "[g]overnment files which contain information not personal to any particular individual" do not qualify even where their disclosure "would nonetheless cause embarrassment to certain persons." *Id.* at 602 n.4.

The second prong involves balancing "the privacy interest at stake . . . against the public interest in disclosure." *Rugiero*, 257 F.3d at 550. The question is "whether public access to the information is tantamount to an invasion of privacy" and this prong protects "names, addresses, and other identifying information even where such information is already publicly available." *Id.* (citations omitted). But even these "invasion[s] of privacy" may be justified by a sufficiently strong "countervailing public benefit from disclosure." *Id.* (citation omitted). And the "only relevant public interest in the FOIA balancing analysis" is "the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or

otherwise let citizens know what their government is up to." *Dep't of Def. v. FLRA*, 510 U.S. 487, 497 (1994) (citation modified).

On appeal, EPI seeks the names of corporate members and prospective members in PGen and CLG, the business email addresses of employees in communication with TVA or McGuireWoods, and (perhaps) the full names of those employees putatively withheld under Exemption Six. If, as asserted at argument, EPI "in [a] footnote of its opening brief said what it was requesting," we have not found it. Oral Arg. at 36:00–10. *Compare* Appellant Br. at 20–21 nn. 3–5 (specifying the documents with respect to which EPI disputed each prong of the Exemption Four analysis), *with id.* at 42–45 (containing no such footnote). Without a list of specific documents, we are unable to do the fine-grained analysis required here.

We will remand with two notes. First, the district court correctly concluded that the names and email addresses of individuals in contact with TVA or McGuireWoods are protected by Exemption Six. Email addresses "can be identified as applying to . . . a particular individual." *Wash. Post*, 456 U.S. at 602. And "names, addresses, and other identifying information" implicate a weighty privacy interest "even [if] such information is already publicly available." *Rugiero*, 257 F.3d at 550. EPI's countervailing interest in knowing "who is influencing the Tennessee Valley Authority, in particular as it relates to [PGen]" is inchoate. Oral Arg. at 11:15–12:30. "[A]ssertions of a public interest in merely 'monitoring' the operation of a federal program, without more, [are] not . . . viewed favorably by the courts." *Heights Cmty. Cong. v. Veterans Admin.*, 732 F.2d 526, 530 (6th Cir. 1984). What is more, the sought names and email addresses are not necessary to that interest. Per counsel for EPI, just having the company names "would fulfill [EPI's asserted] public purpose." Oral Arg. at 11:45–12:30. Under these circumstances, we cannot say that disclosure would be a "[]*warranted* invasion of personal privacy." 5 U.S.C. § 552(b)(6) (emphasis added).

There remains the issue of the companies' names and the domain names within the business email addresses. Exemption Six creates a rule for protecting "individual[s]." *Wash. Post*, 456 U.S. at 602. It has no application to the names of companies. *Cf. id.* at 602 n.4. And we see no reason why the domain names in business email addresses are not reasonably segregable from the full address. The release of, say, "██████@mcguirewoods.com" or

"████@southernco.com" "can[not] be identified as applying to [an] individual." *Id.* at 602. To be sure, the names of CLG members or prospective members in CLG or PGen may be subject to redaction or withholding under Exemption Four. Because the parties have not identified particular documents over which they disagree, we are unable to say whether TVA's withholdings are alternatively justified by an assertion of Exemption Four.

### D.

Finally, EPI asks this court to review the disputed documents *in camera*. Before the district court, it requested such review first over "a sample CLG Update." R. 38, Joint Resp. & Reply Br., at 19–20. After TVA amended the *Vaughn* index, EPI also invited the court to "identif[y]" "categories" of documents for *in camera* review, but it did not request such review of any particular document or category of documents. R. 47, Resp. to Supp. Br., at 1–2, 10. On appeal, EPI first requested *in camera* review to probe segregability, again without identifying what "selection of documents" it was referring to. Appellant Br. at 58. In its reply brief, however, EPI also requests *in camera* review of the AEGIS policy. Reply Br. at 13, 20.

*In camera* review "is a discretionary measure taken after consideration of: (1) judicial economy; (2) actual agency bad faith, either in the FOIA action or in the underlying activities that generated the records requested; (3) strong public interest; and (4) whether the parties request" such review. *Rugiero*, 257 F.3d at 543; *see also* 5 U.S.C. § 552(a)(4)(B) (authorizing *in camera* review). The procedure is to be used "sparingly," *Rugiero*, 257 F.3d at 543, when a *Vaughn* index, affidavits, or other evidence are insufficient to resolve the dispute, *Vaughn v. United States*, 936 F.2d 862, 869 (6th Cir. 1991). We review a district court's decision to conduct this review, or not, for an abuse of discretion. *See id.* at 868.

The district court did not err in declining to conduct *in camera* review of the CLG Updates. As we held, TVA's *Vaughn* index and affidavits suffice to show that this information was properly withheld. And the same is true of the vast majority of the redactions from the insurance policy. Lastly, we decline EPI's generalized request for *in camera* review of unspecified documents. *See United States v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 782 F.3d

260, 264 n.3 (6th Cir. 2015) ("Issues averted to in a perfunctory manner and without developed argumentation are deemed waived.").

### III.

EPI also appeals the denial of its motion for attorneys' fees. We review a district court's decision to grant or deny fees for an abuse of discretion. *Sigmon Fuel Co. v. Tenn. Valley Auth.*, 754 F.2d 162, 166–67 (6th Cir. 1985) (citation omitted). Under this standard, we assess "the district court's evaluation of . . . legal argument[s]" de novo. *Id.* at 167. But we apply an approach more akin to "the clearly erroneous standard" "to findings based upon the district judge's assessment of the probative value of the evidence." *Id.* Remaining questions—like the equitable synthesis of those facts into a dollar-value fee award—are subject to unmodified abuse of discretion review. *Cf. id.*

FOIA permits a court to "assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). Determining whether to award fees is a two-part inquiry. The court first asks "whether the plaintiff 'substantially prevailed' and is thus *eligible* for such an award." *GMRI, Inc. v. EEOC*, 149 F.3d 449, 451 (6th Cir. 1998) (citation omitted) (emphasis added). If a plaintiff is eligible, the court uses its "traditional equitable discretion" to decide "whether the plaintiff is *entitled* to such an award." *Id.* & n.1 (citation modified) (emphasis added).

### A.

In the first three decades of FOIA's life, courts converged on a "catalyst" theory under which a plaintiff whose case had been mooted by voluntary disclosure of the requested documents remained eligible for attorneys' fees if "the existence of the lawsuit" caused the release. *GMRI*, 149 F.3d at 451–52. *See also, e.g.*, *Church of Scientology of Cal. v. Harris*, 653 F.2d 584, 588 (D.C. Cir. 1981); *Miller v. Dep't of State*, 779 F.2d 1378, 1389 (8th Cir. 1985). In 2001, the Supreme Court squarely rejected that view of the "prevailing party" provisions for federal fee shifting statutes. *See Buckhannon Bd. & Care Home, Inc. v. W.V. Dep't of Health & Hum. Res.*, 532 U.S. 598, 603–04 (2001). "[P]revailing party," as a legal term of art, was limited

to circumstances that featured a "judicially sanctioned change in the legal relationship of the parties," whether through contested litigation or a court-approved settlement agreement. *Id.* at 605. Accordingly, the voluntary reversal of an agency's position, without any court order requiring the release of a document, would no longer qualify a plaintiff for attorneys' fees.

Six years later, the OPEN Government Act (OGA) amended FOIA to specify that "[f]or the purposes of [the fees provision], a complainant has substantially prevailed if the complainant has obtained relief through either—a judicial order, or an enforceable written agreement or consent decree; *or* a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii) (emphasis added). Sister circuits have read this amendment as "reinstat[ing] the pre-*Buckhannon* catalyst theory of recovery." *First Amend. Coal. v. Dep't of Just.*, 878 F.3d 1119, 1128 (9th Cir. 2017) (collecting cases from the Second, Fourth, Fifth, Seventh, Eighth, and D.C. Circuits). This reading might be justified by an inference from the timing of *Buckhannon* and the OGA, *see Brayton v. Off. of the U.S. Trade Rep.*, 641 F.3d 521, 525 (D.C. Cir. 2011); or by implication from the statute's requirement that the agency's change be "voluntary or unilateral" and the claim "not insubstantial," 5 U.S.C. § 552(a)(4)(E)(ii); or the requirement that the complainant "obtain[] relief," *id.*; *see Obtain*, Webster's New International Dictionary (2d ed. 1961) ("[t]o get hold of by effort"). In any case, the parties here, along with the district court, each assumed that this was the right reading of the OGA.

On appeal, amicus curiae Public Records Media urges the court to hold that the OGA did not simply reinstate the pre-*Buckhannon* catalyst theory. As amicus curiae sees it, the amended text of subsection (a)(4)(E)(ii) nowhere reinstates the catalyst theory's causation element, instead requiring merely that the claim be "not insubstantial." *See* Br. for Public Records Media as Amicus Curiae at 17–21. But neither party has briefed this question, either here or in the district court. Given the parties' acceptance of the catalyst reading, we will save this puzzle for another day. We assume without deciding that 5 U.S.C. § 552(a)(4)(E)(ii)(II) requires that a plaintiff show that the filing of the lawsuit caused the agency's change in position.

B.

The district court concluded that EPI was ineligible for fees.  Although TVA did release some documents during litigation, it released most of them "in response to new representations by McGuireWoods" that the firm no longer opposed disclosure.  R. 66, Op. & Order, PageID 1135.  So, in the court's view, "*TVA* did not voluntarily or unilaterally change its position at any point during th[e] litigation."  *Id.* at 1134 (emphasis added).  Accordingly, EPI had not "prompted a 'voluntary disclosure or change in position *by the Government*,'" as required by the OGA.  *Id.* at 1135 (quoting *First Amend. Coal.*, 878 F.3d at 1128) (emphasis added); *see also* 5 U.S.C. § 552(a)(4)(E)(ii)(II).  Nor had it shown that the litigation had caused "'the delivery of the information,' sought in its original FOIA requests," as required by the catalyst theory.  R. 66, Op. & Order, PageID 1135–36 (quoting *Batton v. Internal Revenue Serv.*, 718 F.3d 522, 525 (5th Cir. 2013)) (citation omitted).

*1.  EPI is eligible for fees under the district court's and the parties' understanding of the statute.*  The district court's decision understood the statutory terms "voluntary or unilateral" to reflect the relationship between the agency and a third party with respect to any "change of position" regarding document withholding.  As the district court (and both parties) saw it, the question was whether, or not, McGuireWoods *made* TVA release the documents (so it was involuntary) and whether McGuireWoods *influenced* or *jointly-determined* the change (so it was not unilateral).  Deciding the case as the parties framed it, EPI is eligible for fees because, even if TVA's decision was not unilateral, it was voluntary.

Because Exemption Four depends on a third party's information being "confidential," an agency must rely to some extent on that party's representations about confidentiality.  *See Pomares v. Dep't of Veteran Affs.*, 113 F.4th 870, 882–83 (9th Cir. 2024).  TVA's regulations provide that one who submits information to the agency will be given notice of a FOIA request and an opportunity to request nondisclosure under Exemption Four.  18 C.F.R. § 1301.8(e).  And where a third party disagrees with an agency's decision to release its information, it may bring a "reverse-FOIA" suit under the Administrative Procedure Act to prevent disclosure.  *See Chrysler Corp. v. Brown*, 441 U.S. 281, 318–19 (1979); *Jurewicz v. Dep't of Agric.*, 741 F.3d 1326, 1330–32 (D.C. Cir. 2014) (reverse-FOIA suit to enforce Exemptions Four & Six).  So this structure

could be understood to suggest that an agency does not act "unilaterally" in the context of an Exemption Four withholding when its action is prompted by a third party's change of position regarding the confidentiality of requested documents. On that reading of the statute, "unilateral" distinguishes an agency's internal about-face from changes prompted by a third party's withdrawal of withholding requests. And TVA's withholdings were not unilateral because they were prompted by McGuireWoods.

Still, the statute extends to any "*voluntary* or unilateral change in position." 5 U.S.C. § 552(a)(4)(E)(II)(ii) (emphasis added). Changes are "voluntary" when they come "from one's own choice." *Voluntary*, Webster's New International Dictionary (2d ed. 1961). Though TVA solicits views from submitters, it retains the ultimate authority under its regulations to accept or reject a third-party's representations about the applicability of FOIA exemptions, at least until ordered otherwise by a court. *See* 18 C.F.R. § 1301.8(f). TVA's counsel admitted as much at argument. Oral Arg. at 18:10–20:46 (expressing agreement that the agency "make[s] the judgment"). More important still, TVA retains the ultimate obligation to comply with its disclosure requirements. *See* 5 U.S.C. § 552(a)(3)(A) ("*the agency*, upon . . . request . . . shall make the records promptly available" (emphasis added)). Consequently, the choice to release documents is TVA's own. So too the resulting "change in position" when it released 166 documents mid-litigation that it twice previously withheld—in both its initial response and on internal appeal. The district court erred by concluding that this "change in position" was neither voluntary nor attributable to TVA.

2. *EPI would also be eligible for fees on an alternative reading of the statute that parallels* Buckhannon. Having resolved the fee-eligibility issue on the only reading of the statute presented to us (and to the district court), we pause to question whether this reading is correct. The district court and the parties approached the meaning of "voluntary or unilateral" in the context of the dispute before them. In an Exemption Four or Six dispute, an agency mediates between a requester on one side and a third party with an interest in the information on the other. But the OGA's amended fees provision applies to *any* FOIA suit. In some suits, parties disagree over the applicability of the seven other exemptions which do not feature third party interests in controverted information. In other suits, parties dispute, for example, the sufficiency of an

agency's internal search for responsive records, or the timing of an agency's response.  So a blinkered focus on just two exemptions in interpreting the fees provision does not adequately capture the range of its applications.

That distortion is particularly acute for TVA's suggested understanding of "unilateral." If that word merely distinguishes changes prompted by internal deliberation at an agency from changes prompted by a third-party, it has no application outside of Exemptions Four and Six. What's more, all of those changes will nonetheless be "voluntary," as explained above.  So "unilateral" is left to do no work.  This is an unlikely construction.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 176 (2012) ("[C]ourts avoid a reading that renders some words altogether redundant.").

We think another construction makes more sense of the text—one that reads "voluntary or unilateral" in contrast to court orders, not in contrast to the will of a third party.  Recall that Congress passed the OGA after *Buckhannon*.  In *Buckhannon*, the Supreme Court distinguished between legal victories with and without "judicially sanctioned change[s] in the legal relationship of the parties."  532 U.S. at 605.  The latter, the Court held, were insufficient to make one a "prevailing party" entitled to fees.  The Court explained that "[a] defendant's *voluntary* change in conduct," even "*unilaterally* mooting an action before judgment in an effort to avoid an award of attorneys' fees," "lack[ed] the necessary judicial *imprimatur* on the change" to make the plaintiff a "prevailing party."  *Id.* at 605, 608 (first two emphases added). *Buckhannon*'s distinction is mirrored in the OGA's dichotomy between "judicial order[s], or . . . enforceable written agreement[s] or consent decree[s]" on the one hand and "voluntary or unilateral change[s] in position" on the other.  5 U.S.C. § 552(a)(4)(E)(ii).

After all, it might initially seem odd to contrast a consent decree—which, by definition, reflects the voluntary agreement of two parties—with a position "voluntar[ily]" adopted by either one.  But when the relevant question is the agency's relationship to a court, not the agency's relationship to the other interested parties, "voluntary or unilateral" makes sense.  It describes an agency's changes in position neither compelled by a judicial order nor memorialized by one. And the condition is not surplusage, then, because it distinguishes a non-*Buckhannon* prevailing party under subsection (a)(4)(E)(ii)(II) from a *Buckhannon*-type party under subsection

(a)(4)(E)(ii)(I).[8]  To be sure, many such changes will take place under the pressure of litigation or the shadow of an impending adverse ruling—the plaintiff's "claim [must] not [be] insubstantial," after all.  5 U.S.C. § 552(a)(4)(E)(ii)(II).  But such changes remain "voluntary" or "unilateral" in *Buckhannon*'s sense.  And under this reading, too, TVA's pre-*Vaughn* index release of 166 documents during litigation was a "voluntary or unilateral change in position by the agency."

3.  *We remand for further proceedings.*  Two questions remain: whether "the existence of the lawsuit [caused] the release of that information," *GMRI*, 149 F.3d at 451–52, and whether EPI's claim was "not insubstantial," 5 U.S.C. § 552(a)(4)(E)(ii)(II).  The district court addressed only the first of those questions, concluding that causation was lacking.  It is unclear, however, why the district court came to this conclusion.  If the conclusion was rooted in the district court's understanding of "voluntary or unilateral" and its attribution of the change to McGuireWoods, then it was erroneous for the same reasons given above.  But if the district court concluded that TVA would have released the same information whether or not EPI had brought its lawsuit— possibly because McGuireWoods would have reversed its position anyway—then the catalyst theory of the fees provision would bar any award.

We do not read the opinion to clearly evince the latter reading.  Nor has TVA pointed to any evidence to suggest that these documents would have been released anyway.[9]

---

[8]Whether "unilateral" and "voluntary" refer to distinct species of agency change is not a question we need answer today.  It might be that the words form a doublet or a hendiadys, referring to a single concept.  Or perhaps "unilateral" refers to agency action taken without another litigating party's input, *see Buckhannon*, 532 U.S. at 608 (discussing an agency "unilaterally mooting an action"), while "voluntary" refers to settlements that involve an agreement between parties.  In either case, reading the words against *Buckhannon*'s backdrop provides an explanation for Congress's use of both *these* words.

[9]At oral argument, TVA described this mid-litigation release as "essentially the give and take of how FOIA [disputes proceed]."  Oral Arg. at 20:38–49.  But McGuireWoods and TVA did not reverse their position shortly after the initial decision on EPI's FOIA request.  Nor did EPI's administrative appeal prompt the reconsideration.

FOIA's fees shifting provision eases the burden of those who must resort to litigation to effectuate the statute and, conversely, incentivizes an agency to fully comply without the necessity of court oversight.  So an agency seeking to convince the courts that a suit was unnecessary bears the burden of showing that the suit was not the only option to compel compliance.

Relatedly, TVA notes that nearly all of the belatedly released documents were *public* documents attached to emails from CLG or PGen whose release did not provide EPI with information previously unavailable to it.  But that fact cuts both ways.  One wonders why TVA, which could "see the document[s]" over which McGuireWoods

Accordingly, we will not affirm on that ground.  Instead, we remand for the district court to determine in the first instance (1) whether the filing of the suit caused the release of the documents, directly or indirectly, (2) whether EPI's claim was "not insubstantial," and (3) whether EPI is entitled to fees under the traditional equitable standards that govern an award.

Of course, we have also reversed the judgment of the district court with respect to some of the merits issues disputed below.  The fees analysis above concerns only EPI's eligibility for attorneys' fees under § 552(a)(4)(E)(ii)(II) for the documents voluntarily released during litigation. No motion for attorneys' fees under § 552(a)(4)(E)(ii)(I) ("obtained relief through . . . a judicial order") is before this court now.

* * *

We REVERSE the judgment of the district court in part with respect to:

(1) Exemption Four withholdings or redactions of Document Nos. 028, 048, 070, 083, 084, 137, 138, 356, 359, 361, & 362 from Request 109 and the name of the AEGIS representative in the insurance policy partially provided in Request 208;

(2) Exemption Four withholdings or redactions of the names of current members of PGen to the extent they appear in Document Nos. 030–032, 048, 061, 062, 071, 072, 077, 083, 084, 103, 105, 119, 123–25, 129, 130, 132–35, 168, 169, 184, & 356 in Request 109;

(3) Exemption Six withholdings or redactions of the names and email domain names of PGen or CLG members to the extent not otherwise rightly withheld by the assertion of Exemption Four; and

(4) the plaintiff's eligibility for attorneys' fees in connection with documents voluntarily released during litigation.

And we REMAND the case for further proceedings consistent with these holdings. We otherwise AFFIRM.

---

was asserting confidentiality, *id.*, failed to release them in either the initial FOIA determination or the administrative appeal.